UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

– – – – – – – – – – – – – – – – – – – – X

IN THE MATTER OF AN APPLICATION FOR A
SEARCH WARRANT FOR:

THE PREMISES KNOWN AND DESCRIBED AS
OMNIVIEW CAPITAL ADVISORS LLC, LOCATED
AT 140 ROWAYTON AVE, SUITE C, NORWALK,
CONNECTICUT 06853

– – – – – – – – – – – – – – – – – – – – X

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A SEARCH
WARRANT

DISTRICT OF CONNECTICUT, SS:

Michael C. Braconi, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and

acting as such.

Upon information and belief, there is probable cause to believe that there is

located in THE PREMISES KNOWN AND DESCRIBED OMNIVIEW CAPITAL ADVISORS

LLC, LOCATED AT 140 ROWAYTON AVE, SUITE C, NORWALK, CONNECTICUT 06853

(the "PREMISES"), further described in Attachment A, the things described in Attachment B,

which constitute evidence, fruits and instrumentalities of conspiracies to commit securities and

wire fraud, in violation of Title 18, United States Code, Sections 371 and 1349, securities fraud,

in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and wire fraud, in violation

of Title 18, United States Code, Sections 1343.

The source of your deponent's information and the grounds for his belief are as

follows:[1]

---

[1]      Because this affidavit is submitted for the limited purpose of establishing probable cause
for a search warrant, I have not set forth each and every fact learned during the course of the
investigation.

1.     I am a Special Agent with the Federal Bureau of Investigation, and have been since 2010.  During my tenure with the FBI, I have participated in numerous white collar fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations, and analyzing telephone toll information.  During the course of these investigations, I have served as the lead investigator in the investigation and prosecution of persons involved in wire fraud, mail fraud and securities fraud.  I am aware that white collar criminals commonly use electronic means of communication in furtherance of their criminal activities, including but not limited to telephones and electronic mail.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

2.     I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation; (b) reports made to me by other law enforcement and regulatory authorities; (c) information obtained from confidential sources of information, (d) interviews with witnesses and victims;  (e) information obtained from the execution of search warrants  and court-authorized interception of wire and electronic communications; and (f) review of surveillance photographs and other records and reports.  Except where otherwise noted, all conversations described in this Affidavit are set forth in part and in substance only.

## I.   Background

3.     The FBI is currently investigating mail, wire and securities fraud committed through, among other things, the unlawful manipulation of publicly-traded stocks by artificially controlling the price and volume of traded shares in the manipulated stocks through, inter alia: (a) false and misleading press releases; (b) false and misleading SEC filings; (c) fraudulently concealing co-conspirators' ownership interests in the manipulated public companies; (d) generating concocted trading volume in the stock; and (e) unauthorized purchases of stock in accounts of unwitting investors.   The scheme is being perpetrated by a group of financial professionals acting in concert with officers, directors, employees and shareholders of the companies whose publicly-traded stock is being manipulated (collectively, the "Co-conspirators").   Included in this group are the following individuals who are or have been associated with the following entities:

a.     Abraxas J. Discala, also known as "AJ Discala," a resident of the Rowayton area of Norwalk, Connecticut.  Discala is the Chief Executive Officer of OmniView Capital Advisors LLC ("OmniView"), a Delaware limited liability company with its principal place of business at 140 ROWAYTON AVE, SUITE C, NORWALK, CONNETICUT 06853 (the "PREMISES"), and an office in New York, New York.   Discala formed OmniView on or about February 3, 2011.  Discala also controlled The Broadsmoore Group LLC ("Broadsmoore") and Fidelis Holdings, LLC ("Fidelis").  OmniView marketed itself as a merchant bank that sought to create partnerships with companies that were fundamentally sound in order to provide required capital and strategic advice.

        b.      Marc E. Wexler, a resident of Colts Neck, New Jersey, is the Managing Director of OmniView.

        c.      Ira S. Shapiro, a resident of Congers, New York, is the Chief Executive Officer and Chairman of the Board of Codesmart Holdings, Inc.

        d.      Matthew A. Bell, a resident of Boerne, Texas,[2] was registered as a broker and an investment adviser representative.  In or about and between October 2009 and December 2013, Bell was employed as an investment adviser representative by Alamo Investment Advisors, LLC, dba, Alamo Asset Advisors ("Alamo"), an investment adviser firm registered with the United States Securities and Exchange Commission ("SEC").  In or about and between July 2009 and June 2013, Bell was employed as a broker by WFG Investments, Inc. ("WFG Investments"), a brokerage firm registered with the SEC and the Financial Industry Regulatory Authority, Inc. ("FINRA"), at its office in San Antonio, Texas.  In or about and between August 2013 and October 2013, Bell was employed as a broker by Securities America, Inc., a brokerage firm registered with the SEC and FINRA, at its office in San Antonio, Texas.

        e.      Craig L. Josephberg, also known as "Jobo," a resident of New York, New York, is registered as a broker.  In or about and between October 2013 and June 2014, Josephberg was employed as a broker by Meyers Associates, L.P. ("Meyers"), a brokerage firm registered with the SEC and FINRA, at its office in New York, New York.  In or about and between November 2010 and October 2013, Josephberg was employed as a broker by Halcyon Cabot Partners, Ltd. ("Halcyon"), a brokerage firm registered with the SEC and FINRA, at its

---

[2]      Bell recently moved from his prior residence in Helotes, Texas to Boerne, Texas.

office in New York, New York.  Josephberg also controlled Garper LLC ("Garper"), a Delaware limited liability company with its principal place of business in New York, New York.

        f.      Kyleen Cane, an attorney and a resident of Las Vegas, Nevada, is the managing partner of Cane Clark LLP, a law firm that purportedly specialized in providing corporate and securities legal services to public companies with small capitalization.

        g.      Victor Azrak, whose primary residence is in Brooklyn, New York, is the Vice President and Director of Excel Corp. (EXCC), a publicly traded Delaware company with its principal place of business in New York, New York.

        4.      As described in more detail below, this fraudulent scheme first came to the attention of the FBI when agents learned from a confidential source ("CS 1") about the possible stock manipulation of Codesmart Holdings, Inc. and its affiliated companies (hereinafter collectively "CodeSmart").  However, as discussed below, CodeSmart shares are not the only securities being manipulated.  The evidence now demonstrates that the Co-conspirators have manipulated and are continuing to manipulate other publicly traded stocks, including the stocks of: (i) Cubed, Inc. ("Cubed"), trading under the symbol CRPT; (ii) StarStream Entertainment Inc. ("StarStream"), trading under the ticker symbol SSET; and (iii) The Staffing Group, Ltd. ("Staffing Group"), trading under the ticker symbol TSGL.  As discussed below, the Co-conspirators are using, among other things, computers, that contain electronically stored information and data, and other documents, communications and electronic data, including e-mails, to accomplish this unlawful activity.

        5.      During the course of the investigation, the government applied for and received several court orders for pen registers, cell site orders, text search warrants and e-mail

search warrants relating to cellular telephones and e-mail accounts used by certain co-conspirators. In addition, on May 1, 2014, the Honorable P. Kevin Castel, United States District Judge for the Southern District of New York, authorized the interception of wire and electronic communications over 914-255-7892, a cellular telephone subscribed to Abraxas J. Discala ("the Discala Cell Phone"). Interception began on May 2, 2014. On May 30, 2014, the Honorable Alvin K. Hellerstein, United States District Judge for the Southern District of New York, authorized the continued interception of the Discala Cell Phone. Interception of the Discala Cell Phone terminated on June 29, 2014.

6.     As set forth below, information obtained pursuant to these warrants and orders furthered the investigation by providing highly relevant communications between the Co-conspirators concerning the ongoing manipulation of publicly traded stocks, including the stock of Cubed.

7.     On July 14, 2014, a grand jury returned a ten-count indictment against Discala, Wexler, Shapiro, Bell, Josephberg, Cane, and Azrak, and arrest warrants were issued. The indictment and arrest warrants remain under seal, and these individuals are expected to be arrested shortly. A copy of the indictment is attached as Attachment C.

## II.     The CodeSmart Manipulation

### A.     The CodeSmart Reverse Merger

8.     First Independence Corporation ("First Independence") was founded in Florida in February 2012 as a public corporation, and as such was able to be traded publicly under the ticker symbol "FICF." As set forth in the attached indictment, in January 2013, First Independence sold its entire lot of 3,000,000 shares to twenty-four shareholders, based primarily

in Florida, for $0.0115 per share, raising $34,500 for the company. From February 2013 to April 2013, there was no public trading of First Independence's stock. On May 3, 2013, First Independence acquired CodeSmart in a reverse merger. Following the reverse merger, the new company operated under the CodeSmart name. Between May 7, 2013 and May 24, 2013, the 24 aforementioned First Independence shareholders sold all 3,000,000 shares to individuals and entities connected to Discala and Wexler for a purchase price of $0.023 per share (exactly double the purchase price for the original shareholders).

9.      Although the merger appeared to have First Independence subsume CodeSmart, by an amendment in its articles of incorporation executed that same month by Chief Executive Officer ("CEO") Ira Shapiro (who was not the CEO of First Independence before the merger), First Independence changed its name to CodeSmart Group Holdings, Inc., and later changed its ticker symbol to "ITEN." Thus, CodeSmart, a private company, effectively took over First Independence, a publicly-traded company, in a way that enabled CodeSmart to become a publicly-traded company.

10.      CodeSmart traded under the ticker symbol ITEN. On its website and public filings, CodeSmart marketed itself as a company whose business plan consisted of furnishing the healthcare industry with educated, trained and qualified "ICD-10" certified coders.[3]   CodeSmart offered "CodeSmart University" as "an online program of study for existing coders, new coders, clinicians and healthcare roles of all types."

---

[3]      ICD-10, the tenth revision of the International Statistical Classification of Diseases and Related Health Problems, a medical classification list created by the World Health Organization, was the medical coding system mandated by the Centers for Medicare and Medicaid Services as part of the Patient Protection and Affordable Care Act of 2010.

**B.**     <u>The Fraudulent Manipulation of CodeSmart</u>

11.     As described in the attached indictment, after gaining control of

CodeSmart's unrestricted shares, Discala, Wexler, Shapiro, Bell and Josephberg, together with

others (the "CodeSmart Co-Conspirators"), devised a scheme whereby they fraudulently inflated

CodeSmart's share price and trading volume and then sold the unrestricted CodeSmart stock at a

profit when the share price reached desirable levels.  Such a scheme is commonly referred to as a

"pump and dump."

12.     In furtherance of the CodeSmart stock manipulation scheme, the

CodeSmart Co-Conspirators, with others, coordinated their trading activity with the issuance of

company press releases, a number of which contained false and misleading information.  For

example, shortly after the reverse merger, CodeSmart issued a press release, on May 28, 2013,

stating that "[t]he CodeSmart Group Inc. . . . announces today that its CodeSmart University

product is the exclusive strategic partner for ICD-10 education and consulting services to

Binghamton University, part of the State University of New York ('SUNY') system, which will

exclusively market and provide CodeSmart University products to their students in the School

for Continuing Education."  The press release included a quote from CEO Shapiro, stating

"Binghamton University has already begun to offer CodeSmart University programs for both

experienced coders and new coders [and] will serve as the distribution channel to all SUNY

schools throughout New York State."  Based on my conversations and email communications

with representatives of Binghamton University, I have determined that this press release was not

authorized by Binghamton University and contained multiple material false statements.  First,

CodeSmart was not the "exclusive strategic partner" for ICD-10 education courses at

Binghamton University, as Binghamton University also offered courses through other providers,

and Binghamton University had no plans to exclusively market CodeSmart University to its

students.  Second, contrary to Shapiro's quote that made it appear as if many students had taken

the CodeSmart University course, Binghamton University had been offering the CodeSmart

course for some time but only one person had ever registered to take the course.

13.     The above-described false statements made CodeSmart appear to the

public to be more successful than it was in actuality.  Based on my training and experience, I

know that material false statements to the public in favor of a company's business can have the

effect of artificially increasing the share price of that company's stock.  As described below,

such increases were subsequently seen in CodeSmart shares.

14.     On May 28, 2013, the date of the press release involving Binghamton

University, the volume of CodeSmart shares traded jumped significantly – approximately triple

the volume traded the day before the press release.  In addition, on the date of the press release,

the price of CodeSmart shares increased by almost five percent, from $5.02 per share to $5.26

per share, a substantial one-day increase for a company's share price.

15.     On June 4, 2013, CodeSmart issued a press release stating that "The

CodeSmart Group Inc. . . . announces today that its CodeSmart University product is the

exclusive strategic partner for ICD-10 education and consulting services to Ramapo College in

Northern New Jersey, which will exclusively market and provide CodeSmart University products

to their students at the Center for Innovative and Professional Learning."  This press release

contained a material false statement in that, in addition to the press release not being authorized by Ramapo College, as of the date of the statement Ramapo College had not finalized an agreement with CodeSmart but, rather, the parties were only in the advanced negotiation stage.

16.     Later in the day, after the issuance of the press release, on June 4, 2013, a representative of Ramapo College emailed representatives of CodeSmart to complain about the unauthorized press release, stating that she was "very concerned" about the press release, noting "[a]s you know, we are not yet approved . . . to proceed with a contract for this program." The email further requested that CodeSmart "halt any further communications/promotions about a partnership with Ramapo College." A CodeSmart employee responded by email the same day and apologized for the press release. At approximately the same time, CodeSmart's CEO Ira Shapiro similarly apologized via email, claiming CodeSmart "certainly will consult with you next time we do a promotion." However, Shapiro noted, "This is all done in the spirit of promoting business opportunities for you as a partner." CodeSmart never issued a revised or amended press release concerning its relationship with Ramapo College. Shapiro's June 4, 2013, email indicates that, at the time the press release was issued, CodeSmart's CEO knew that the claim that the "CodeSmart University product is the exclusive strategic partner for ICD-10 education and consulting services to Ramapo College" was false.

17.     On June 4, 2013, the date of the press release involving Ramapo College, the price of CodeSmart shares increased by approximately three percent. That same week, other announcements from CodeSmart caused yet additional increases such that, by Friday of that week, the price of CodeSmart shares had increased approximately 18 percent in just five days.

18.     In the period between May 13, 2013 and July 12, 2013, CodeSmart issued press releases at the approximate rate of one press release every three days and in that period the stock price of CodeSmart rose by 291 percent.  In fact, on July 12, 2013, CodeSmart publicly filed with the SEC an amended Form 8-K, which on page 12, under a section titled "Plan of Operations," stated, "We estimate about $10 million in revenues over the following 12 months from the date of this Report."  On the date of that filing, CodeSmart's share price peaked, closing at $6.94 per share.  Based on my training and experience, I know that a rise of 291 percent is an unusually rapid rise and an unusually high rate of share price increase.

19.     Over the next month, the share price rapidly decreased, such that by August 19, 2013, the company was valued at $2.50 per share.  In fact, on August 19, 2013 – approximately one month after the company's $10 million revenue forecast – CodeSmart filed a Form 10-Q with the SEC stating that the company did "not have sufficient funds to fully implement [its] business plan" and that, if they did not obtain the funds, CodeSmart "may need to curtail or cease [its] operations until such time as [it has] sufficient funds."  Thus, in the span of one month, CodeSmart's revenue forecast went from $10 million to ceasing operations, effectively a $0 revenue forecast.

20.     Three days later, however, on August 22, 2013, CodeSmart issued a press release stating that it had partnered with Millennium HealthCare, Inc. to market its ICD-10 educational and consulting services for medical practices and hospitals.  A few days after that, on August 26, 2013, at a time when CodeSmart's stock was rising and closed at $3.10 per share, CodeSmart issued a letter to its shareholders that stated, in part: "If we continue on the track we are on, I believe we will achieve our revenue and profit goals that were previously disclosed for

2013 and beyond. We believe we have access to a large market of potential students which we estimate to be over 40 million people looking for careers at any given time."

21.    The next day, on August 27, 2013, CodeSmart filed with the SEC a Form 8-K, signed by Shapiro, in which CodeSmart announced that CodeSmart's Chief Executive Officer, Shapiro, had purchased 25,000 shares of the company's stock from the public market at the market value of $3.21 per share for a cost of $80,250. In this SEC filing, Shapiro stated that his "stock purchase [was] symbolic of [his] confidence in the Company and its mission." In reality, Shapiro did not pay for the 25,000 CodeSmart shares purchased in his brokerage account. On September 4, 2013, the same day that Shapiro paid $81,278 from his personal bank account to his brokerage firm for the 25,000 shares of CodeSmart, Discala directed the transfer of $81,278 from Fidelis' bank account to Shapiro's personal bank account.

22.    Between August 21, 2013 and August 30, 2013, CodeSmart's share price more than doubled, rising from $2.19 to $4.60. CodeSmart's share price then went into a rapid decline, dropping to $2.13 by September 20, 2013. All of the above-noted facts, as well as my training and experience, support my belief that individuals associated with CodeSmart disseminated false statements in an effort to artificially inflate the price of CodeSmart shares. At the close of business on May 23, 2014, CodeSmart's share price was $0.29. The chart below, from Yahoo! Finance, a website that reports market information, displays the rise and subsequent fall of CodeSmart's share price and trading volume from June 2013 through May 2014.



23.    The fraudulent manipulation of CodeSmart's stock is further evident from an examination of the economic reality.  At a stock price of $6.94, a price reached on July 12, 2013, CodeSmart's market capitalization was $86,347,800.  However, that same day, CodeSmart filed with the SEC an amended Form 10-K, signed by Shapiro, in which CodeSmart listed only $6,000 in total assets, $7,600 in revenue and a net loss of $103,141.  By December 30, 2013, CodeSmart's stock was trading at $0.66 per share, and on July 9, 2014, CodeSmart's stock closed at $0.01 per share.

**C.**     **The Co-Conspirators Coordinated Trading in Codesmart**

24.     Between May 13, 2013 and September 20, 2013, Discala and his co-conspirators coordinated the trading of their unrestricted shares with press releases and SEC filings issued by Shapiro to maintain a market in CodeSmart and sell their considerable holdings in CodeSmart at substantial profits.  Notably, in the days leading up to CodeSmart's public filings with the positive revenue forecasts discussed above – the July 12, 2013 Amended 8-K and the August 26, 2013 letter to shareholders – Discala exchanged a number of cellular telephone text messages with Shapiro.  Specifically, Discala exchanged seven text messages with Shapiro on July 11, 2013, and three additional messages on July 12, 2013.  Discala exchanged ten messages with Shapiro on August 23, 2013, the Friday prior to the Monday, August 26, 2013 release of the letter to shareholders.

25.     In addition, the phone records demonstrate the coordination and regular contact between Discala and his co-conspirators.  For example, between May 1, 2013 and October 31, 2013, a six-month period, the co-conspirators exchanged numerous calls and text messages with one another.  Specifically:

- Discala and Wexler – Over 8,600 times

- Discala and Josephberg – Over 7,900 times

- Discala and Bell – Over 5,500 times

- Discala and Shapiro – Over 100 times

26.     The transfer agent records revealed that Discala, Wexler, Bell and Josephberg controlled the vast majority of CodeSmart's "freely trading" float, which they attempted to conceal through entities and other individuals.  Both Bell and Josephberg received

125,000 purportedly unrestricted shares of CodeSmart for pennies in exchange for investing certain of their customer base in CodeSmart. When trading started in earnest on May 13, 2013, Discala and Wexler flooded the market with CodeSmart's shares. This trading, which often constituted a significant portion of the volume of trading in CodeSmart, included multiple days where they bought and sold large amounts of stock with no evident economic purpose.

27.     Discala carried out a substantial portion of the trading in the name of his administrative assistant and in the name of LLCs for which he was the CEO. I believe Discala did this in order to avoid being seen as holding more than five percent of the outstanding shares of CodeSmart and thereby becoming subject to SEC reporting obligations. Discala also repeatedly paid excessive commissions for his transactions in CodeSmart. In fact, at one point, Raymond James & Associates, Inc. ("Raymond James") sent him a letter warning him that the commissions he was paying for his trading were excessive. Even after receiving this letter, Discala continued to use the Raymond James account to trade CodeSmart.

28.     Beginning in May 2013, Discala and his co-conspirators used Bell's clients' accounts to dump their CodeSmart shares. Between May 13, 2013 and May 29, 2013, Wexler, Discala, Discala's assistant and OmniView sold approximately 340,000 shares. During that time period the price of CodeSmart spiked, moving from $3.55 when trading opened to $5.47 – a 70 percent increase. The buyers of these shares were mainly Bell clients. For example, on May 16, 2013, Wexler sold 1,000 shares at $4.34 per share directly to a client of Alamo Investment Advisors LLC ("Alamo"), where Bell was employed. In sum, Alamo clients purchased approximately 205,000 shares of CodeSmart during this time period.



29.     In addition, two sets of Bell clients stated that Bell purchased CodeSmart

shares in their accounts without their consent.  For example, in or about June 2013, Bell

persuaded his clients, a married couple identified herein as "Bell Clients A and B," to purchase

CodeSmart shares. According to Bell Clients A and B, Bell did not warn them of the risks in

purchasing CodeSmart shares or penny stocks in general.  On or about August 13, 2013, Bell

Client A emailed Bell to complain about the falling value of his stock portfolio, noting that "in

retirement, [he] cannot afford the volatile situation" and money loss.  Bell Client A requested a

meeting with Bell and that meeting was set for August 21, 2013.  In the days leading up to the

meeting, there was a spike in text message communications between Bell and Discala.  Bell and

Discala had exchanged only five text messages on August 18, 2013.  In comparison, on August

19 and August 20, 2013, they exchanged 85 and 100 text messages, respectively.  At the August

21, 2013 meeting, Bell offered to sell Bell Clients A and B an additional 30,000 shares of CodeSmart for 14 cents per share. That day, the stock closed at $2.19 per share. Bell told Bell Clients A and B that purchasing those shares at the discounted price and selling them at the publicly-traded price would allow them to profit such that they would recoup the value of their portfolio. Notably, on the date of the meeting, Bell and Discala exchanged 73 text messages, 70 of which occurred prior to start of the meeting. At Bell's heavy urging, Bell Clients A and B signed the agreement and received the share certificate, which they still hold. The stock purchase agreement for 30,000 shares of CodeSmart at $0.14 per share that Bell offered Bell Clients A and B was issued by Fidelis and signed by Discala, which I believe is further evidence of Discala's central role in this manipulation scheme.

30. At the same time that Bell was buying CodeSmart in his clients' accounts, he was selling those shares from his personal trading account. Instead of depositing his 125,000 CodeSmart shares in an account with his employing broker-dealer, Alamo, Bell opened a brokerage account at Amegy Investments, Inc. ("Amegy"), a local Texas-based brokerage firm affiliated with his bank. From May 2013 through October 2013, Alamo's clients purchased over one million shares of CodeSmart, while Bell sold 99,500 shares of CodeSmart that were in his Amegy account. Nearly half of the one million shares purchased by Alamo accounts were purchased in Individual Retirement Accounts (IRAs), which suggests that Bell was using his clients' retirement savings for the CodeSmart stock purchases. Thus, Bell was purchasing shares in his clients' accounts without telling them that he was personally taking an opposite position in the stock.

31.     During the two pump and dump periods, Bell was in near constant touch with Discala.   Between May 1, 2013 and October 18, 2013, Bell and Discala spoke or texted close to 6,000 times, Bell and Discala's administrative assistant spoke or texted close to 400 times, and Bell and Wexler spoke or texted close to 80 times.   Similarly, the pattern of text messages between Bell and Discala initially increased day-by-day over the period between May 13, 2013 and June 6, 2013.   Then, between June 6, 2013 and July 12, 2013, there was a sustained elevated average of approximately 50 messages per day on the non-weekend days, with several peaks over that period, including on July 12, 2013, when they sent 92 text messages back and forth.

32.     Like Bell, Josephberg also used his customers' accounts to enable himself and his co-conspirators to sell out of their position in CodeSmart.   In particular, during the second pump and dump that took place between August 22, 2013 and September 20, 2013, Josephberg and Josephberg's sale assistant, engaged in heavy buying of CodeSmart in Josephberg's customers' accounts.   Between August 29, 2013 and September 20, 2013, accounts controlled by Josephberg and his assistant at Halcyon purchased at least 100,000 shares of CodeSmart in customer accounts.

33.     Like Bell, during the two pump and dump periods, Josephberg was in near constant touch with Discala.   Between May 1, 2013 and October 31, 2013, Josephberg and Discala called or texted each other close to 8,000 times.   Between August 20, 2013 and September 20, 2013, when many of Josephberg's clients were buying CodeSmart, Josephberg and Discala spoke or texted close to 1,756 times.   In addition, throughout the entire period of the

CodeSmart pump and dump, Josephberg was in frequent e-mail contact with Discala and Discala's assistant.

34.     At the same time that Josephberg was buying CodeSmart in his customers' accounts, he was selling shares through his Garper accounts.  From May 2013 through October 2013, Josephberg purchased at least 140,000 shares of CodeSmart stock on behalf of his customers while selling at least 256,000 shares of CodeSmart stock in the Garper accounts.  For example, on August 29, 2013, Josephberg bought 9,000 CodeSmart shares in the accounts of two of his customers, and sold 8,100 shares through his Garper account.  Josephberg never disclosed to these two customers that he was personally taking an opposite position, a material omission and strong proof of his intent to defraud.

35.     Over the course of the scheme, CodeSmart's stock had the following remarkable price movements:

- May 13, 2013 - $1.17
- July 12, 2013 - $6.94
- August 21, 2013 - $2.19
- August 30, 2013 - $4.60
- September 20, 2013 - $2.13
- December 30, 2013 - $0.66
- July 3, 2014 - $0.02

36.     This fraudulent manipulation scheme was highly profitable for Discala, Wexler, Bell and Josephberg.  Discala made approximately $3 million trading CodeSmart, including $600,000 in profit in an account held in Discala's assistant's name but controlled by

Discala.   Discala's co-conspirators also profited significantly from this pump and dump.  Wexler made over $2.2 million, Josephberg made approximately $750,000, and Bell made approximately $550,000. Although Shapiro did not receive unrestricted stock, he was paid a salary of $225,000.  In addition, as detailed above, Shapiro received 25,000 shares of CodeSmart that were paid for by Discala.

## III.   The Cubed Manipulation

### A.   The Formation of Cubed

37.      Northwest Resources Inc. ("NWRS") was incorporated in Nevada on May 21, 2010 and purported to be a mining exploration stage company.  In reality, NWRS was a shell company with only nominal assets and no revenues from inception through the end of its most recent fiscal year.   Similar to First Independence, NWRS never took any significant steps in furtherance of its purported business plan.  Indeed, on February 12, 2014, Northwest filed a Form 10-K, for the period ending November 30, 2013, which noted that Northwest did "not have any arrangements for financing [additional operations,]" "had not earned any revenues since the inception of [the] current business operations[,]" had losses over $150,000 that far exceeded any assets and thus had "substantial doubt[s] about [its] ability to continue" as a functioning corporation.  As of the February 12, 2014 filing date, Northwest's financial situation had not changed.

38.      On March 6, 2014, NWRS filed a Form 8-K with the SEC reporting that its CEO had resigned from the company and appointed Douglas Shinsato as the new sole officer and director.  Prior to this appointment, Shinsato was the President and COO of Crackpot, a "developer of a mobile-first information communications technology that offers users a digital

platform for the creation of content that combines text, images, audio, and video." (See Form 8-K at 1). Similar to the CodeSmart reverse merger, an officer from the private entity replaced the leading officer in the public entity. Approximately one week later, on March 14, 2014, the company filed another Form 8-K explaining that NWRS had changed its name to "Cubed, Inc." and was in the process of changing its ticker symbol to "CRPT." On March 24, 2014, Cubed filed a Form 8-K reporting that it had entered into an intellectual property purchase agreement with Crackpot pursuant to which it acquired intellectual property, a "mobile first-platform," from Crackpot.

39.     Thus, the new company called Cubed now had (1) Crackpot's former officer at the helm, (2) Crackpot's business through the intellectual property and (3) Crackpot's theoretical goodwill and name recognition through its new ticker symbol CRPT. Although the morphing of Crackpot into NWRS/Cubed through an asset purchase agreement was not a reverse merger, as was the case with CodeSmart and FICF, the end result was that Crackpot, a private company, effectively became Cubed, a publicly-traded company. On March 26, 2014, Cubed's board of directors appointed Joseph White as the new CEO and President, replacing Shinsato. (See Form 8-K filed on March 27, 2014). White was an original founder of Crackpot and an even higher-level officer than Shinsato.

40.     Pursuant to the terms of the Intellectual Property Purchase Agreement, Crackpot was compensated by Cubed with $350,000 and 2,537,455 shares of Cubed common stock, all of which was due to be paid in installments starting in mid-April 2014. (See Form 8-K filed on March 24, 2014). Since at the time of the agreement Cubed common stock was a penny stock (attached to a company that had no assets), the terms of the contract indicated that the

intellectual property assets were actually worth at least $350,000. That amount also reflected the value of Cubed, since those assets effectively were all that Cubed possessed.

**B.     Trading in Cubed Coordinated by the Co-Conspirators**

41.     On March 28, 2014, 200 shares of Cubed were sold at $5 per share. On April 22, 2014, after 15 days of no trading activity, Cubed's stock began trading in earnest at a price of $5.25 (the stock closed at $5.20). A review of the evidence, including trading records and text messages, shows that from April 22, 2014 through April 30, 2014, Discala, Wexler, Bell, Josephberg, Kyleen Cane and Victor Azrak, together with others (the "Cubed Co-Conspirators"), were responsible for manipulating the vast majority of the trading activity in Cubed. Of the 57,088 shares of Cubed bought during this period, 32,000 of them were bought through Josephberg's assistant at Meyers Associates. For example: (i) Dounya Discala (Discala's wife) bought 6,100 shares and sold 700 shares; (ii) Joseph Discala (Discala's father) bought 1,500 shares; (iii) Bell bought 4,450 shares; (iv) Victor Azrak bought 500 shares; and (v) Ruben Azrak, Victor Azrak's father, bought 3,000 shares.

42.     On March 28, 2014, Morning Star, a ratings agency and provider of market information, reported that 200 shares of Cubed had been sold for a price of $5 per share. Although the amount of shares traded was small, because there was limited public information on the new company, Morning Star extrapolated from the $5 sales price that Cubed had a market capitalization of, or was worth, $148.85 million. Yahoo! Finance similarly valued Cubed on March 28, 2014, at almost $150 million. These approximately $150 million extrapolations of market capitalization based on the outstanding shares and $5 share price stand in stark contrast to the approximately $350,000 that Cubed paid Crackpot to obtain all its assets. As demonstrated

below, the investigation has revealed that Discala and his co-conspirators set the $5 share price

and controlled the trading in Cubed.

43.     From April 22, 2014 through May 22, 2014, Cubed's share price gradually

increased from a close of $5.20 to $5.42.  Then on May 23, 2014, Cubed's share price

skyrocketed to a high of $7.05 before closing at $6.30.  From May 23, 2014 through July 2,

2014, Cubed's stock has been steady and fluctuated between $6.30 and $6.70.  This gradual but

significant price increase from $5.00 per share on March 28, 2014 to $6.70 on July 2, 2014 – a

significant increase of 34% for no apparent reason – further demonstrates the manipulation by

Discala and his co-conspirators.  Cubed's stock's valuation does not reflect the underlying

economics of the company.  At $6.58 per share, Cubed's market capitalization is approximately

$170 million.  However, in a 10-Q filed for the period ending February 28, 2014, Cubed reported

less than $1,500 in cash, negative stockholders equity, a loss of $15,000, and accrued

professional fees of $131,824.

44.     The government obtained a limited number of text messages for

telephones subscribed to by Bell and Wexler,[4] and also intercepted Discala's calls and texts

between May 2, 2014 and June 29, 2014.  I believe that the communications intercepted over the

Discala cell phone, including some of those described below, show that the Cubed Co-

Conspirators, and others, fraudulently manipulated Cubed's stock by artificially controlling the

_____

[4]     The three text search warrants issued were: (i) on April 11, 2014, by Magistrate Judge
Marilyn D. Go  (EDNY 14-MC-406); (ii) on April 24, 2014, by Magistrate Judge Vera M.
Scanlon (EDNY 14-MC-481); and (iii) on June 3, 2014, by Magistrate Judge Viktor V.
Pohorelsky (EDNY 14-MC-517).

price and volume of Cubed's stock through, <u>inter alia</u>, match trades and wash trades.[5]  Rather

than generating significant market interest and causing a quick pump and dump that would elicit

regulators' scrutiny, the Cubed Co-Conspirators engaged in a scheme that gradually increased

the price of Cubed's stock to give it the appearance of a legitimate company with genuine and

steady market demand for the security.  The evidence shows that Discala was able to exercise

control of this process through a number of corrupt brokers and investors and by placing by the

vast majority of Cubed's stock into one or more escrow accounts controlled by Cane.  For the

text messages and calls described below, not all relevant portions of such communications have

been described.  To the extent that quotations are used from intercepted conversations in the

descriptions below, the quoted segments are based on line sheets and drafts transcripts of the

recordings and not final transcripts.  Also, all dates and times are approximate and based on the

monitoring equipment at the time the call was intercepted.

    45. On April 2, 2014, starting at approximately 12:34 p.m. EST, Bell texted

Discala, "I got buyers in the market in California for cube. Do u know when it is live to buy[?]"

Discala responded, "Waiting with baited breathe[.]"

---

[5] Wash trades are purchases and sales of securities that match each other in price, volume and time of execution, and involve no change in beneficial ownership.  For example, a wash trade takes place when Investor A buys 100 shares at $5.00 of Company A through Broker A while simultaneously selling 100 shares at $5.00 of Company A through Broker B.  Match trades are similar to wash trades but involve a related third person or party who places one side of the trade.  For example, a match trade takes place when Investor A buys 100 shares at $5.00 of Company A through a broker, while Investor B, who coordinates with Investor A, simultaneously sells 100 shares at $5.00 of Company A through a broker.  Both wash trades and match trades are used to create the appearance that the stock price rose as a result of genuine market demand for the securities.

46.     On April 11, 2014,  starting at approximately 4:14 p.m. EST, the following text message exchange took place took place between Discala and Bell:

| | |
|---|---|
| Bell: | FedEx send you money for cube on Monday. Made out to Omniview |
| Discala: | Great |
| Bell: | I'm excited about Monday. Cube start the trade. |
| Discala: | Yes sir |
| Bell: | Sweet. Have a great weekend |

47.     On April 17, 2014, starting at approximately 11:39 a.m. EST, the following text message exchange took place between Discala and Bell:

| | |
|---|---|
| Bell: | Any idea on cube trading. I'm bidding 5.25 |
| Discala: | Not yet. |
| Bell: | Today you think?  Ingot buyers ready and they are asking |
| Discala: | I think so. |
| Bell: | Cool |
| Discala: | Tell them to bid size |
| Bell: | Ok |

48.     On April 22, 2014, the first real day of trading in Cubed, starting at approximately 8:07 a.m. EST, the following text message exchange took place between Discala and Bell:

| | |
|---|---|
| Bell: | I got my bids in again. Let's see how it goes |
| Discala: | Me too. |
| Bell: | We be trading |

Discala:     Buy some brother. Let's go.

Bell:        Just did. 5.25

Discala:     400 shares. Let's make some calls

    49.     On April 24, 2014, starting at approximately 10:41 a.m. EST, the

following text message exchange took place between Discala and Bell, during which Discala

asked Bell to get his contacts to bid $5.27 for Cubed stock:

Discala:     Make calls.

Discala:     Bids please

Bell:        What price

Discala:     527

Bell:        Ok.

Discala:     Where's u r cali guys

Bell:        Incalled last night

Discala:     Need buys. Bad

Bell:        Bidding 800 at 5.27

Discala:     Hurry

Discala:     Nice.

Bell:        I filled

    50.     Also on April 24, 2014, Wexler complimented Discala on a Cubed press

release that had been issued that day: "That's a nice release! Well done pops." Discala replied,

"Trying my best."

51.    On May 2, 2014, starting at approximately 5:26 pm EST, the following telephone conversation took place between Discala and Azrak, in which they discuss both the stock price of Cubed and Discala's prior scheme involving Codesmart (ITEN):

| | |
|---|---|
| Azrak: | Let me just tell you something: You know that Jobo is so bad, he can even make the Cube go down. [laughs] |
| Discala: | I know it went high, and then it went down. It was definitely Jobo. |
| Azrak: | That was a huge drop today, no? No, you know what bothered me? He ruined our streak. |
| Discala: | No, I'm fine with it. It was a penny. Remember, I had a penny down in ITEN. |
| Azrak: | You did? |
| Discala: | One — yeah, one penny.. |

52.    On May 8, 2014, starting at approximately 9:40 a.m. EST, Discala spoke to a corrupt investor ("Investor 1") who had invested in Cubed through an escrow arrangements that Discala coordinated. Discala explain the structure as follows:

| | |
|---|---|
| Discala: | I'm well sir, I got that email, the wonderful thing about the CUBE is some big announcement coming, on that … the escrow, when you say, when is your stock available for sale, you've already sold some, you're an [U/I] owner in the escrow so there's been like 90 thousand shares sold. They haven't done a distribution [U/I] 30 days but there's already a half a million dollars that's been sold |
| Investor 1: | Ok, I didn't know if you could sell it or there was a lock up period. |
| Discala: | No, no, this is part of the supply, we'll call it, right, it is in different escrows not controlled by us and it's sent into the market as demand is needed, so there's no evil that can play with us. There's no shorts that can come in, I mean if you look at the box right on the level 2 it's incredible if 531 - 531 by 532 and it goes to 7 - 750 [U/I] |

Investor 1:    So I'm already making money

Discala:       Yea, you're already making money, yeah, absolutely and the interesting
               thing is that [Investor 1] you nor I nor any my father nor any of the 25
               people in the escrow, right, gets out before anybody else [U/I] it's all
               tiramisu

Investor 1:    It's all. [U/I], that's good, so you're going to sell it off over the next 3
               months or 6 months?

Discala:       Yea, I would say this thing's going to rip, I mean I would say that we be
               doing the escrow, you're exactly right, 3-6 months on the markets

       53.     On May 8, 2014, starting at approximately 6:52 p.m. EST, the following

text message exchange took place between Discala and Wexler:

Discala:       Had great call with [Kyleen Cane]. She's on the marketing.

Wexler:        That's friggin great news. Wow can wait to hear those details. That's so
               [good] to hear

Discala:       Just had it. She's on it bro. Had call 30 minutes ago. She's ramping up

       54.     On May 17, 2014, starting at approximately 5:28 p.m. EST, the following

telephone conversation took place between Discala and Wexler regarding Discala's plan to

purchase software from Cubed so that it would look like Cubed was generating business:

Discala:       And we're gonna, we're gonna pay, we're gonna buy a piece of software
               from the Cube...so we look like

Wexler:        When?

Discala:       In May; so we're cash flow positive.

Wexler:        We're going to buy a piece of software from the Cube.

Discala:        Correct. So our deal is going to pay the Cube two-fifty, because these
                guys can't generate revenue, so I'm going to generate it myself.

    55.    On May 20, 2014, starting at approximately 5:46 p.m. EST, the following

text message exchange took place between Discala and Josephberg, during which Discala

instructed Josephberg to buy Cubed stock and he agreed to purchase stock in his client's account:

Josephberg:    I spoke [to Kyleen Cane] she awesome

Discala:       I KNOW. BEEN TELLING YOU THAT. BUY CRPT. GOING NUTS

Josephberg:    Why [is] no[] one buying? I am going to buy more for clients...meet
               tomorrow?

Josephberg:    I just need to get my hands on some liquidity...

Josephberg:    And more clients lol

    56.    On May 20, 2014, starting at approximately 7:29 p.m. EST, the following

telephone conversation took place between Discala and Azrak, during which they discussed a

conversation between Cane and Josephberg about the escrow account, Discala explained that he

controlled the stock price of Cubed ("I'm the fucking brake and the gas"):

Discala:        Dude, it went up – by the way, [Josephberg] goes up to [Kyleen Cane]
                I'm buying CRPT for my clients tomorrow. I'm like I told you you
                fucking idiot. [U/I]

Azrak:         Yeah, he tells me...uh...he tells me he had a great conversation with her,
               you know.  You know, about the escrow. She didn't really want to talk
               about the escrow too much, you know?

Discala:        Of course not, not with a fucking idiot like Jobo!  Of course not!

Azrak:         I told them they can't really tell you that stuff.  I told him you really
               shouldn't have –

Discala:  I told him not to talk about it. He's a fucking asshole! That's what he is. He's an asshole. Because he's putting at risk our proprietary...I'm telling ya.  It's like Apple giving away software.  He's a fucking asshole.

\*          \*          \*

Azrak:  How high does it really go?

Discala:  Which one?

Azrak:  CRPT.

Discala:  I think 55.

Azrak:  [U/I] Give me a real number, over-under.

Discala:  55.

Azrak:  Seriously?

Discala:  I'll take the over-under on 55 by the end of the year.

Azrak:  How you like me now?

Discala:  I'll bet you 100 thousand dollars right now.

Azrak:  Seriously? … That means I make 10, so I don't give a fuck.

Discala:  Exactly, I'll bet you 100 grand.  I'll bet you 100 grand.  Done.  We'll write it up tomorrow. We'll sign it.

Azrak:  How you like me now?

Discala:  By the way, by the way you're a fucking idiot.

Azrak:  [U/I]

Discala:  You're an idiot.

Azrak:  [U/I]

Discala:  No, no, no.  You're just an idiot, by the way.

| Azrak: | Why?  You said 55 bucks. |
|---|---|

| Discala: | Right, because I'm the fucking brake and the gas, jackass. If I take my foot off the brake it's 55 [dollars] tomorrow (Laughter) |
|---|---|

57.     On May 21, 2014, starting at approximately 12:53 p.m. EST, the following telephone conversation took place between Discala and Cane, during which Cane informed Discala that her investor relations/public relations  ("IR/PR") contacts would assist with the marketing of Cubed, she had lined up two short-term investors ("interim money"), and Discala asked Cane to have her associate bid $5.42 for Cubed stock:

| Cane: | And, and I think, uh, I just got a great call, um, with my, uh, IR/PR guys |
|---|---|

| Discala: | Great. |
|---|---|

| Cane: | You know they're going to be doing it and I also just talked to two people that are gonna probably going to put in another half a million into Cubed for some interim, interim money. Do you want me to have them go through you for this? Or do you want me to just— |
|---|---|

| Discala: | No I don't care. Just do it. No, no, I don't, I—there's no pride of authorship. We're a team. I think it's wonderful you should take the credit. |
|---|---|

| Cane: | No, I [U/I] |
|---|---|

| Discala: | I, I, I told them— |
|---|---|

| Cane: | I would much rather you take the credit. [laughs] |
|---|---|

| Discala: | OK, so I have no problem. That'd be great. But the bottom line is— |
|---|---|

| Cane: | I'll just tell them—I'll just tell them it's, uh, you know, part of the team. |
|---|---|

| Discala: | Yeah, that's exactly right. I have no problems, no issues. Can you just do, do me a favor? Can you go—can you just make a quick call and go 5 4 2 [on Cubed]? Because Chardan's getting mad that it's just sitting there. It just looks like, it just looks crazy. I'm trying to lift 'em. |
|---|---|

| Cane: | Wait who? |
|---|---|

Discala:     Just go 5 4 2. Have [your associate] go 5 4 2, not 5 4 0.

Cane:       Oh, oh 5 4 2.

Discala:     It just looks like it's so deep. You gotta just—he's gotta move it around a

Cane:       OK, all right. Wait, why does it look stupid?

Discala:     Because it just — he just sits there and we go in a thousand, five hundred, a thou— I mean it just sits there, it looks like it's the, the abyss.

Cane:       OK. All right, I don't know if we want, if we want to keep it, you know,

Discala:     Go 5 4 1, 5 4 1, 5 4 1 is fine.

Cane:       OK. All right. I'll, um, I'll  ask him to move it up a little.

58.     On May 23, 2014, due to poor coordination with a co-conspirator, Discala briefly lost control of his manipulation of Cubed's share price, which caused it to surge from the previous day's closing price of $5.42 to an intraday high of $7.05 per share.  However, as reflected in the intercepted calls, Discala was able to regain control that same day and brought the share price back down to have it close at $6.30 per share.  During a telephone call that morning, Discala and Cane discussed the jump in Cubed's price to $7 per share, and Cane stated, in part, "We need to keep it back down now. We need to keep it back down."  Later that day, during a telephone call between Discala and Azrak, Discala stated, in part, "I talked to Kyleen, and we, we don't want this.  We would want 6.35 today, 6.30, something like that, and then let, let news rip it next week."  Finally, Discala also called Wexler to explain the trading in Cubed's share price, and stated, in part, "Yeah like…it just looks stupid!  It went up, and up, and then it came back, you know – it's like, look, if we ended at 6.30, we're good.  I want to bring it back up to 6.55; 6.55 on Tuesday, which I can, with some news, right?  And just keep stepping it."

59.     On May 30, 2014, at approximately 9:59 am, Josephberg called Discala.
Discala stated, "Do me a favor . . . can you do five hundred CRPT five times every five
minutes[?]" Josephberg confirmed, "CRPT a hundred every five minutes[,]" but added, "Won't
that look weird [rather] than just buying five hundred[?]" Discala responded, "No it looks
better[,] do a hundred then two hundred then a hundred[,] you know it looks better[.]"
Josephberg concluded, "Alright." I believe that in this conversation, Discala directed Josephberg
to buy Cubed stock in a way that would upwardly inflate the share price and volume.

60.     I believe that Discala, Wexler, Bell, Josephberg, Cane, and Azrak,
together with others, are continuing to fraudulently manipulate Cubed's stock using the escrow
account. On June 23, 2014, Cubed reached its highest closing price of $6.75 per share. At $6.75
per share, Cubed's market capitalization was approximately $200 million. On April 21, 2014,
however, Cubed filed with the SEC a Form 10-Q and reported less than $1,500 in cash, negative
stockholders equity, a net loss of $15,000 and accrued professional fees of $131,824. On July 9,
2014, Cubed's stock price closed at $6.60 per share, which indicates that it is still in the
controlled pump phase of the fraudulent manipulation scheme orchestrated by the Cubed Co-
Conspirators, as is further evident from the chart below.



## IV.   The Manipulation of StarStream and Staffing Group

61.   In addition to CodeSmart and Cubed, Discala and his co-conspirators, engaged in manipulative trading regarding other securities, including StarStream (SSET) and Staffing Group (TSGL), by artificially controlling the price and volume of StarStream's and Staffing Group's stock through, inter alia, wash trades and match trades. Discala coordinated the fraudulent buying and selling of these stocks through the use of, inter alia, text messages and telephone calls.

62.     On May 7, 2014, WEXLER sent a text message to DISCALA, stating, "We may need to buy SSET at close.  I think EJA has some $.  Got get it to 15 cents. LOL what a joke."  That day, StarStream's stock price closed at $0.30 on 41,100 trading volume, a significant decrease from the previous day's closing price of $0.48 on 16,200 trading volume.  The following day, on May 8, 2014, StarStream's stock price closed at $0.15 per share, exactly the price proposed by Wexler.

63.     On May 13, 2014, before trading commenced, Discala sent a text message to Bell, stating, "We got good stuff going. Sset. Should be over a buck today."  That day, StarStream's stock price, which opened at $0.35 per share, reached an intraday high of $1.05 per share, before closing at $0.80 per share.

64.     On May 7, 2014, BELL sent a text message to DISCALA, stating, "TSGL is tanking. We still good?"  In response, DISCALA stated, "Yes. Buy all u can at 20 or better. We're cleaning it up."  On May 7, 2014, Staffing Group's stock price closed at $0.25 on 178,300 trading volume, a significant decrease from the previous day's closing price of $0.36 on no trading volume.

65.     On May 16, 2014, Discala sent a text message to Josephberg, stating, "Call in victors [Azrak] tsgl.  Supposed to be good til cancel. This shot affects us."  On May 16, 2014, the trading volume in the Staffing Group was 13,500 compared to 1,700 on the previous trading day and 2,500 on the following trading day.

66.     On May 30, 2014, Discala sent a text message to Wexler, stating, "Buy 5k more ts [TSGL] market im gonna get this thing flying."  On May 30, 2014, Staffing Group's

stock price closed at $0.42 per share on 187,300 trading volume, which was almost double the

closing price of $0.23 on 6,000 trading volume on the previous day.

67.     In addition to the stocks described above, I believe that Discala intends to

continue manipulating stocks of other companies.  On June 9, 2014, Discala spoke to an

individual who is currently on the board of directors of a private company ("BD1").  During that

call, BD1 stated, among other things, that once the company was "public," they should "lock up

a majority of the shares."  Later in the conversation, BD1 explained further, "What I have

suggested . . . is that you pick people you trust, and there should be quite a few of those, and we

register and put into their accounts 2,000, not a lot of shares.  The reason we do that, we want to

have, in 100 different brokerage accounts throughout the country, some shares sitting there so

that we can create demand later on."  Discala agreed, "Yeah," and added, "I'll explain how I do

that.  It's very simple."

## V.     THE PREMISES

68.     The PREMISES, OMNIVIEW CAPITAL ADVISORS LLC, LOCATED

AT 140 ROWAYTON AVE, SUITE C, NORWALK, CONNECTICUT 06853, described in

Attachment A, is likely to contain evidence, fruits, and instrumentalities of the fraudulent stock

manipulation schemes described above.  First, the investigation has confirmed that Discala

operates OmniView out of the PREMISES.  OmniView's website (www.omniviewcap.com) lists

the PREMISES as the address of its Connecticut office,[6] and Discala's primary residence is near

the PREMISES in the Rowayton area of Norwalk, Connecticut.  OmniView's website also lists a

---

[6]     The OmniView website lists the address of the premises as 140 ROWAYTON AVE,
SUITE C, ROWAYTON, CONNECTICUT 06853.  Rowayton is a section of Norwalk,
Connecticut.

second office address on East 39th Street, New York, New York.  However, based on information

provided by a confidential source and gathered during the interception of Discala's cell phone, it

appears that OmniView no longer operates from this space and may be sharing other office space

in New York, New York with another business.  FBI agents conducting surveillance on May 5,

2014 observed Discala entering the PREMISES, and they also later observed him exiting the

PREMISES approximately an hour and a half later with two other individuals, including co-

defendant Victor Azrak.  During the time period that Discala's cell phone was intercepted,

Discala also refers to working out of his Connecticut office.  For example, on May 20, 2014,

Discala told a potential investor that he usually worked in Connecticut.  On June 3, 2014, Discala

told another associate that he would call him from his office in Connecticut later that day.

      69.    In addition, in numerous intercepted conversations, Discala refers to

documents relating to the manipulated stocks being generated, sent or received from OmniView,

by email or other means.  For example, Discala told certain investors that they would have to

sign a participation agreement to participate in the escrow accounts that that held Cubed stock.

These documents are being sent and received by email by individuals associated with

OmniView, including Discala, Wexler, Dounya Discala (Discala's wife), who is listed as part of

the  OmniView management team on OmniView's website and Discala's administrative

assistants.  Also, as described above, on April 11, 2014, Bell told Discala that he would send

Discala, by FedEx, money for Cubed, with the check made out to OmniView.  I would expect

that evidence of this transaction and others involving the manipulated stocks would be

maintained in OmniView's office.

70.     I have been informed by an Assistant U.S. Attorney that, under the relevant case law, in the event of a search of business premises that are "permeated with fraud," a broad search warrant that authorizes the search and seizure of voluminous business records does not run afoul of the Fourth Amendment. National City Trading Corp. v. United States, 635 F.2d 1020, 1026 (2d Cir. 1980) (citing United States v. Brien, 617 F.2d 299, 309 (1st Cir. 1980)); see also United States v. Johnson, 108 F.3d 1370, 1997 WL 136332, at *3 (2d Cir. Mar. 21, 1997) (unpublished summary order) (affirming broad search where affidavit "show[ed] ample ground for finding pervasive fraud"). In this case, given the apparent interconnections of the various business entities and individuals and the resulting fraud schemes, a broad seizure of data in the PREMISES is warranted.

## VI.   Technical Background

71.     As described above and in Attachment B, this application seeks permission to search for records constituting evidence, fruits or instrumentalities of violations of Title 18, United States Code, Sections 371 and 1349 (conspiracies to commit securities, mail wire fraud), Title 15, United States Code, Sections 78j(b) and 78ff (securities fraud), and Title 18, United States Code, Section 1343 (wire fraud) that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of computers and electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

72.     I submit that if a computer[7] or storage medium[8] is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

---

[7]     For purposes of the requested warrant, a computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, server computers, and network hardware, as well as wireless routers and other hardware involved in network and Internet data transfer.

[8]     A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded. Examples include external hard drives, CDs and DVDs, and flash drives.

        c.      Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from the use of an operating system or application, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

        d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

        e.      Based on actual inspection of other evidence related to this investigation, including spreadsheets and financial records, I am aware that computer equipment was used to generate, store, and print documents used in the stock manipulation schemes.  There is reason to believe that there is a computer system currently located on the PREMISES.

        f.      As further described in Attachment B, this application seeks permission to locate not only electronic computer files that might serve as direct evidence of the crimes described on the warrant, but also electronic "attribution" evidence that establishes how the computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any computer or storage medium in the PREMISES because:

        g.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file

(such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

      h.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, Internet search histories, configuration files, user profiles, email, email address books, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

      i.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how the computers were used, the purpose of their use, who used them, and when.

      j.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an

message

accurate conclusion is a dynamic process.  Whether data stored on a computer is evidence may

depend on the context provided by other information stored on the computer and the application

of knowledge about how a computer functions.  Therefore, contextual information necessary to

understand other evidence also falls within the scope of the warrant.

        k.     Further, in finding evidence of how a computer was used, the

purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular

item is not present on a storage medium.  For example, the presence or absence of counter-

forensic programs or anti-virus programs (and associated data) may be relevant to establishing

the user's intent.

        73.     In most cases, a thorough search for information that might be stored on

computers and storage media often requires agents to seize such electronic devices and later

review the media consistent with the warrant.  In lieu of removing storage media from the

premises, it is sometimes possible to "image" the date stored on such devices.  Generally

speaking, imaging is the taking of a complete electronic picture of the computer's data, including

all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the

accuracy and completeness of data recorded on the storage media, and to prevent the loss of the

data either from accidental or intentional destruction.  This is true because of the time required

for examination, technical requirements, and the variety of forms of electronic media, as

explained below:

        a.     The time required for an examination.  As noted above, not all

evidence takes the form of documents and files that can be easily viewed on-site.  Analyzing

electronic data for attribution evidence and conducting a proper forensic examination requires

considerable time, and taking that much time on the PREMISES could be unreasonable.  Given

the ever-expanding data storage capacities of computers and storage media, reviewing such

evidence to identify the items described in the warrant can take weeks or months, depending on

the volume of data stored, and would be impractical and invasive to attempt on-site.

          b.     Technical requirements.  Computers can be configured in several

different ways, featuring a variety of different operating systems, application software, and

configurations.  Therefore, searching them sometimes requires tools or knowledge that might not

be present on the search site.  The vast array of computer hardware and software available makes

it difficult to know before a search what tools or knowledge will be required to analyze the

system and its data on the PREMISES.  However, taking the storage media off-site and

reviewing it in a controlled environment will allow its examination with the proper tools and

knowledge.

          c.     The variety of forms of electronic media.  Records sought under

this warrant could be stored in a variety of storage media formats that may require off-site

reviewing with specialized forensic tools.

         74.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant

I am applying for would authorize seizing, imaging, or otherwise copying computers and storage

media that reasonably appear to contain some or all of the evidence described in the warrant, and

would authorize a later review of the media or information consistent with the warrant.  The later

review may require techniques, including, but not limited to, computer-assisted scans of the

entire medium, that might expose many parts of a hard drive to human inspection in order to

determine whether it is evidence described by the warrant.

## VII.   **CONCLUSION**

75.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the PREMISES there exists evidence of crimes.  Accordingly, a search warrant is requested.

76.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation, and that the main targets described herein have not yet been arrested and there is a risk of flight or that evidence may be compromised.  Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

WHEREFORE, your deponent respectfully requests that the requested search warrant be issued for the PREMISES KNOWN AND DESCRIBED AS OMNIVIEW CAPITAL ADVISORS LLC, LOCATED AT 140 ROWAYTON AVE, SUITE C, NORWALK, CONNETICUT 06853.

IT IS FURTHER REQUESTED that all papers submitted in support of this application, including the application and search warrant, be sealed until further order of the Court.

Michael C. Braconi,
Special Agent
Federal Bureau of Investigation

Sworn to before me this
15th day of July, 2014
/s/

THE HONORABLE HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF CONNETICUT

**ATTACHMENT A**
Property to Be Searched

The property to be searched is the PREMISES KNOWN AND DESCRIBED AS OMNIVIEW CAPITAL ADVISORS LLC ("OMNIVIEW"), LOCATED AT 140 ROWAYTON AVE, SUITE C, NORWALK, CONNETICUT 06853.

The PREMISES are located on the second floor of a two-story commercial building located at 140 Rowayton Avenue, in the Rowayton area of Norwalk, Connecticut. The outside of the building is painted light brown with dark brown and grey shingles. The exterior doors of the building used to access the second floor have a coded access pad on the frame. However, during normal business hours, the door does not appear to be locked. A directory posted inside the entrance to the building lists OmniView as being on the second floor, and there is a flight of stairs leading to the second floor. On the second floor, OmniView's offices occupy one side of the floor, and are accessed through a door marked with OmniView's name. Photographs of the exterior of the PREMISES are below.





**ATTACHMENT B**
Property to be Seized

All records relating to violations of Title 18, United States Code, Sections 371, 1341, 1343 and 1349, and Title 15, United States Code, Sections 78j(b) and 78ff, and involving Abraxas J. Discala, Marc E. Wexler, Ira S. Shapiro, Matthew A. Bell, Craig L. Josephberg, Kyleen Cane, and Victor Azrak, since February 2012, including, but not limited to[1]:

      a.     Documents pertaining to entities that Abraxas J. Discala (Discala) owns, controls, manages, or represents, including OmniView Capital Advisors LLC ("OmniView"), The Broadsmoore Group LLC ("Broadsmoore") and Fidelis Holdings, LLC ("Fidelis").

      b.     Documents that appear to relate to any other entities that Discala owns, controls, manages, or represents, including documents pertaining to bank accounts, escrow accounts, investment holdings, investment funds, fund administrators, fund advisors, investment advisors and trusts.

      c.     Documents pertaining to entities that Discala, OmniView, Broadsmoore and Fidelis may have invested in including Codesmart Holdings, Inc. and its affiliated companies (collectively "CodeSmart"), Cubed, Inc. ("Cubed"), StarStream Entertainment Inc. ("StarStream") and The Staffing Group, Ltd. ("Staffing Group").

---

[1]     For purposes of the requested warrant, the terms "records" and "information" include evidence of the specified crime(s) in whatever form and by whatever means it may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, or painting); any mechanical form (such as printing or typing); and any photographic form (such as videos, digital and print photographs, or photocopies).

      d.      Documents reflecting purchases and sales, or attempted purchases and sales, involving the stock of CodeSmart, Cubed, StarStream and Staffing Group.

      e.      Documents concerning the finances of Abraxas J. Discala, Dounya Discala, Marc E. Wexler, Ira S. Shapiro, Matthew A. Bell, Craig L. Josephberg,  Kyleen Cane, Victor Azrak, OmniView, Broadsmoore, Fidelis, CodeSmart, Cubed, StarStream and Staffing Group, including, but not limited to, promissory notes, bank statements, wire transfer records, checks, accounting ledgers, financial statements, federal and state tax records, and records or logs pertaining to management fees and/or performance fees.

      f.      Documents concerning communications between Abraxas J. Discala, Dounya Discala, Marc E. Wexler, Ira S. Shapiro, Matthew A. Bell, Craig L. Josephberg, Kyleen Cane, Victor Azrak, and others pertaining to CodeSmart, Cubed, StarStream and Staffing Group.

      g.      Documents concerning communications with potential investors, investors, brokers, company insiders, and individuals involved in investor relations, public relations or press releases pertaining to CodeSmart, Cubed, StarStream, and Staffing Group, including, but not limited to, emails, letters, agreements, offering memoranda, Power Point presentations, brochures, prospectuses, advertisements, promotional videotapes, account statements, lists of entities or individuals contacted or to be contacted, contracts or agreements or drafts of contracts or agreements, notes or memoranda, correspondence and the envelopes or packages in which the correspondence was mailed or transported, facsimile transmissions, including, but not limited to, logs, records or confirmations of facsimile transmissions, logs or

records of telephone calls, telephone bills or account statements and bills or account statements for courier services.

    h.  Computer hardware, meaning any and all computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical or similar computer impulses or data.  Included within the definition of computer hardware is any data-processing hardware (such as central processing units and self-contained laptop or notebook computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical and compact disk storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communication devices (such as wireless broadband internet connection devices, modems, cables and connections, recording equipment, RAM and ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone generating devices); and any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

    i.  Computer software, meaning any and all information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical or other media, which is capable of being interpreted by a computer or its related components.  Computer software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs,

4

compilers, interpreters, communications software, and other programming used or intended to be used to communicate with computer components.

        j.      Computer-related documentation, meaning any written, recorded, printed, or electronically-stored material which explains or illustrates the configuration or use of any of the seized computer hardware, software or related items.

        k.      Computer passwords and data security devices, meaning any devices, programs, or data -- whether themselves in the nature of hardware or software -- that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer hardware, computer software, computer-related documentation, or electronic data records.  Such items include, but are not limited to, data security hardware (such as encryption devices, chips, and circuit boards); passwords; data security software or information (such as test keys and encryption codes); and similar information that is required to access computer programs or data or to otherwise render programs or data into usable form.

        l.      Any computer or electronic records, documents, and materials, including those used to facilitate interstate communications, in whatever form and by whatever means such records, documents, or materials, their drafts or their modifications, may have been created or stored, including, but not limited to, any hand-made form (such as writing or marking with any implement on any surface, directly or indirectly, relating to the described offense); any photographic form (such as microfilm, microfiche, prints, slides, negative, video tapes, motion pictures or photocopies); any mechanical form (such as photographic records, printing or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact

disks); or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical disks, printer buffers, sort cards, memory calculators, electronic dialers, or electronic notebooks), as well as printouts or readouts from any magnetic storage device.

m.     Any electronic information or data, stored in any form, which has been used or prepared for use either for periodic or random backup (whether deliberate, inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, CD-ROM disks, video cassettes, and other media capable of storing magnetic or optical coding.

n.     Any electronic storage device capable of collecting, storing, maintaining, retrieving, concealing, transmitting, and using electronic data, in the form of electronic records, documents, and materials, including those used to facilitate interstate communications. Included within this paragraph is any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment, such as fixed disks, external hard disks, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, laser disks, or other memory storage devices.

o.     Records of personal and business activities relating to the operation of a computer, such as telephone records, notes (however and wherever written, stored or maintained), books, diaries, and reference materials relating to the described offense.

p.      Any records or documents pertaining to accounts held with Internet Service Providers or of Internet use.

q.      Mobile telephones and related devices, including wireless Internet broadband connection devices.

r.      Any other evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 371, 1341, 1343 and 1349, Title 15, United States Code, Sections 78j(b) and 78ff.

SC:WMP/WMN/SCJ

**CR 14 - 00399**   ROSS, J.

F. #2013R01203

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ABRAXAS J. DISCALA,
    also known as "AJ Discala,"
MARC WEXLER,
IRA SHAPIRO,
MATTHEW BELL,
CRAIG JOSEPHBERG,
    also known as "Jobo,"
KYLEEN CANE and
VICTOR AZRAK,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**I N D I C T M E N T**

SCANLON, M.J.

Cr. No. _____

(T. 15, U.S.C., §§ 78j(b) and 78ff;
T. 18, U.S.C., §§ 371, 981(a)(1)(C),
1343, 1349, 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    The Defendants and Relevant Entities

       1.    The defendant ABRAXAS J. DISCALA, also known as "AJ Discala," a

resident of Rowayton, Connecticut, was the Chief Executive Officer of OmniView Capital

Advisors LLC ("OmniView").  DISCALA formed OmniView on or about February 3, 2011.

DISCALA also controlled The Broadsmoore Group LLC ("Broadsmoore") and Fidelis Holdings,

LLC ("Fidelis").

2.      OmniView was a Delaware limited liability company with its principal place of business in Rowayton, Connecticut, and an office in New York, New York. OmniView marketed itself as a merchant bank that sought to create partnerships with companies that were fundamentally sound in order to provide required capital and strategic advice. OmniView claimed to possess a team of seasoned professionals who had extensive knowledge of the capital markets, including having: (i) experience in raising capital through private placements, alternative public offerings and reverse takeovers of companies whose shares were traded on the Over-the-Counter ("OTC") exchanges; (ii) substantial contacts to bolster management boards; and (iii) a model that prevented any conflicts of interest between OmniView, investors and the target companies.

3.      The defendant MARC WEXLER, a resident of Colts Neck, New Jersey, was the Managing Director of OmniView.

4.      The defendant IRA SHAPIRO, a resident of Congers, New York, was the Chief Executive Officer and Chairman of the Board of CodeSmart Holdings, Inc. ("CodeSmart") and First Independence Corp. ("First Independence").

5.      The defendant MATTHEW BELL, a resident of Helotes, Texas, was a registered broker and investment adviser representative. In or about and between October 2009 and December 2013, BELL was employed as an investment adviser representative by IA Firm 1, an investment adviser firm registered with the United States Securities and Exchange Commission ("SEC"). In or about and between July 2009 and June 2013, BELL was also employed as a broker by BD Firm 1, a broker-dealer registered with the SEC and the Financial Industry Regulatory Authority, Inc. ("FINRA"), at its office in San Antonio, Texas. In or about

2

and between August 2013 and October 2013, BELL was employed as a broker by BD Firm 2, a broker-dealer registered with the SEC and FINRA, at its office in San Antonio, Texas.

    6.  The defendant CRAIG JOSEPHBERG, also known as "Jobo," a resident of New York, New York, was registered as a broker. In or about and between November 2010 and October 2013, JOSEPHBERG was employed as a broker by BD Firm 3, a broker-dealer registered with the SEC and FINRA, at its office in New York, New York. In or about and between October 2013 and June 2014, JOSEPHBERG was employed as a broker by BD Firm 4, a broker-dealer registered with the SEC and FINRA, at its office in New York, New York. JOSEPHBERG also controlled Garper LLC ("Garper"), a Delaware limited liability company with its principal place of business in New York, New York.

    7.  The defendant KYLEEN CANE, an attorney and resident of Las Vegas, Nevada, was the managing partner of Cane Clark LLP, a law firm that purportedly specialized in providing corporate and securities legal services to public companies with small capitalization.

    8.  The defendant VICTOR AZRAK, a resident of New York, New York, was the Vice President and Director of Excel Corp. ("EXCC"), a publicly traded Delaware company with its principal place of business in New York, New York.

II.  The Relevant Publicly Traded Companies

    9.  CodeSmart, formerly First Independence, was a Florida corporation with its principal place of business in New York, New York. CodeSmart traded under the ticker symbol ITEN. CodeSmart's purported business plan consisted of furnishing the healthcare industry with educated, trained and qualified "IGD-10" certified coders. ICD-10, the tenth revision of the International Statistical Classification of Diseases and Related Health Problems, a medical classification list created by the World Health Organization, was the medical coding

system mandated by the Centers for Medicare and Medicaid Services as part of the Patient Protection and Affordable Care Act of 2010. CodeSmart offered "CodeSmart University" as "an online program of study for existing coders, new coders, clinicians and healthcare roles of all types."

10.     Cubed, Inc. ("Cubed"), formerly a mining exploration company known as Northwest Resources, Inc. ("Northwest"), was a Nevada corporation with its principal place of business in Las Vegas, Nevada. Cubed traded under the ticker symbol CRPT. Cubed's purported business plan involved the "Get CUBED" mobile-first platform, which Cubed claimed was "a cloud-based, three-dimensional functional cube that appears on the screens of mobile device owners, allowing developers and users to present complex and contextual concepts in a clear and simple manner."

11.     StarStream Entertainment Inc. ("StarStream"), formerly Gelia Group, Corp., was a Nevada corporation with its principal place of business in Monterey, California. StarStream traded under the ticker symbol SSET. StarStream's purported business plan consisted of producing, promoting, supporting and developing motion pictures and funding motion picture entities.

12.     The Staffing Group, Ltd. ("Staffing Group"), formerly Aviana, Corp., was a Nevada corporation with its principal place of business in New Orleans, Louisiana. Staffing Group traded under the ticker symbol TSGL. Staffing Group's purported business plan consisted of recruiting, hiring, employing and managing skilled workers for its clients.

III.     The Fraudulent Market Manipulation Schemes

13.     In or about and between October 2012 and July 2014, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO,

4

MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and

VICTOR AZRAK, together with others, agreed to defraud investors and potential investors in

CodeSmart, Cubed, StarStream and Staffing Group (collectively, the "Manipulated Public

Companies") by artificially controlling the price and volume of traded shares in the Manipulated

Public Companies through, inter alia: (a) false and misleading press releases; (b) false and

misleading SEC filings; (c) fraudulent concealment of the defendants' and their co-conspirators'

ownership interests; (d) engineering price movements and trading volume in the stocks; and (e)

unauthorized purchases of stock in accounts of unwitting investors.

### A.    The CodeSmart Manipulation Scheme

#### (i)    Control of the Unrestricted Stock

14.     In April 2012, First Independence filed a Form S-1 with the SEC to

register an offering of 3,000,000 shares of its stock, which was made effective on August 7,

2012.  In or about January 2013, despite projecting an extremely pessimistic outlook in prior

SEC filings, First Independence sold its entire lot of 3,000,000 unrestricted or free trading shares

to twenty-four shareholders, based primarily in Florida, for $0.0115 per share, raising $34,500

for the company.  The 3,000,000 shares were registered with First Independence's transfer agent

on February 7, 2013.  From February 2013 to April 2013, there was no public trading of First

Independence's stock.  On or about May 3, 2013, CodeSmart, a private company, was acquired

by First Independence, a shell public company, in a reverse merger.  Following the reverse

merger, the new company operated under the CodeSmart name.

15.     In or about May 2013, the defendants ABRAXAS J. DISCALA, also

known as "AJ Discala," MARC WEXLER, MATTHEW BELL and CRAIG JOSEPHBERG,

also known as "Jobo," together with others, purchased the 3,000,000 unrestricted shares at

$0.023 per share from the aforementioned twenty-four shareholders. The new stock certificates were sent to Attorney 1, a New York attorney associated with DISCALA whose identity is known to the Grand Jury. The defendants and their co-conspirators concealed their ownership interest in the 3,000,000 unrestricted shares by distributing the shares across a number of co-conspirators and by placing them in nominee accounts designed to conceal the true owners of the shares. On June 14, 2013, CodeSmart implemented a 2-for-1 forward stock split of its common stock which caused the 3,000,000 shares controlled by DISCALA and his co-conspirators to double to 6,000,000 shares.

(ii)     The Fraudulent Stock Manipulations

16.     After gaining control of CodeSmart's unrestricted shares, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW BELL and CRAIG JOSEPHBERG, also known as "Jobo," together with others (collectively, the "CodeSmart Co-Conspirators"), devised a scheme whereby they fraudulently inflated CodeSmart's share price and trading volume and then sold the unrestricted CodeSmart stock at a profit when the share price reached desirable levels. Such a scheme is commonly referred to as a "pump and dump."

17.     The first pump and dump occurred between approximately May 13, 2013 and August 21, 2013. During this first period, the CodeSmart Co-Conspirators manipulated CodeSmart's stock price by raising it from $1.77 to a high of $6.94, before causing it to drop to $2.19.

18.     The second pump and dump occurred between approximately August 21, 2013 and September 20, 2013. During this second period, the CodeSmart Co-Conspirators

manipulated CodeSmart's stock price by raising it from $2.19 to a high of $4.60, before causing it drop to $2.13.

19.     CodeSmart's market capitalization at its highest closing price of $6.94 per share on July 12, 2013 was $86,347,800.  However, that same day, CodeSmart filed with the SEC an amended Form 10-K, signed by SHAPIRO, in which CodeSmart listed only $6,000 in total assets, $7,600 in revenue and a net loss of $103,141.  By December 30, 2013, CodeSmart's stock was trading at $0.66 per share, and on July 9, 2014, CodeSmart's stock closed at $0.01 per share.

20.     In furtherance of the CodeSmart stock manipulation scheme, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW BELL and CRAIG JOSEPHBERG, also known as "Jobo," together with others, coordinated their trading activity with the issuance of company press releases, a number of which contained false and misleading information.  These press releases, which touted agreements between CodeSmart and various universities and learning institutions, were issued at an accelerated rate in an effort to generate market interest in the stock.

21.     On or about May 28, 2013, CodeSmart issued a press release which stated, in part, that "its CodeSmart University product is the exclusive strategic partner for ICD-10 education and consulting services to Binghamton University, part of the State University of New York ('SUNY') system, which will exclusively market and provide CodeSmart University products to their students in the School for Continuing Education."  Contrary to this representation, CodeSmart was not the "exclusive strategic partner" for ICD-10 education courses at Binghamton University because Binghamton University also offered courses through other providers and had no plans to exclusively market CodeSmart University to its students.

7

Upon issuance of this press release, the trading volume of CodeSmart's shares surged to 316,000 compared to 122,400 the trading day before the press release.

22.     In furtherance of the CodeSmart stock manipulation scheme, during the first pump and dump period, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW BELL and CRAIG JOSEPHBERG, also known as "Jobo," together with others, filed and caused to be filed with the SEC forms that contained material misrepresentations and omissions. For example, on July 12, 2013, the day CodeSmart's stock closed at its highest share price of $6.94, CodeSmart filed with the SEC an amended Form 8-K, signed by SHAPIRO, in which CodeSmart estimated "about $10 million in revenues over the following 12 months from the date of this Report." On August 19, 2013, approximately one month later and the day CodeSmart's stock price had dropped dramatically to $2.50 per share, CodeSmart filed with the SEC a Form 10-Q, signed by SHAPIRO, which stated that the company did "not have sufficient funds to fully implement [its] business plan," and that, if they did not obtain the funds, CodeSmart "may need to curtail or cease [its] operations until such time as [it has] sufficient funds."

23.     In furtherance of the CodeSmart stock manipulation scheme, during the second pump and dump period, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW BELL and CRAIG JOSEPHBERG, also known as "Jobo," together with others, filed and caused to be filed with the SEC forms that contained material misrepresentations and omissions. For example, on August 26, 2013, at a time when CodeSmart's stock was rising and closed at $3.10 per share, CodeSmart filed with the SEC a Form 8-K, signed by SHAPIRO, in which SHAPIRO stated, "If we continue on the track we are on, I believe we will achieve our revenue and profit goals that were previously disclosed

8

for 2013 and beyond." The next day, on August 27, 2013, CodeSmart filed with the SEC a Form 8-K, signed by SHAPIRO, in which CodeSmart announced that CodeSmart's Chief Executive Officer, SHAPIRO, had purchased 25,000 shares of the company's stock from the public market at the market value of $3.21 per share for a cost of $80,250. In this SEC filing, SHAPIRO extolled his purchase of CodeSmart stock and stated that his "stock purchase [was] symbolic of [his] confidence in the Company and its mission." In reality, SHAPIRO did not pay for the 25,000 CodeSmart shares purchased in his brokerage account. On September 4, 2013, the same day that SHAPIRO paid $81,278 from his personal bank account to his brokerage firm for the 25,000 shares of CodeSmart, DISCALA directed the transfer of $81,278 from Fidelis' bank account, which DISCALA controlled, to SHAPIRO's personal bank account.

(iii)   <u>Profits at Investors' Expense</u>

24.     The defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, MATTHEW BELL and CRAIG JOSEPHBERG, also known as "Jobo," together with others, profited by selling CodeSmart stock, issued to them at pennies, to BELL's clients at IA Firm 1 and JOSEPHBERG's customers at BD Firm 3. On some occasions, DISCALA, WEXLER, BELL and JOSEPHBERG, together with others, sold CodeSmart shares to BELL's clients at IA Firm 1 and JOSEPHBERG's customers at BD Firm 3 without their clients' and customers' knowledge and consent and without providing them with required disclosure documents.

25.     At the same time that the defendant MATTHEW BELL, together with others, was purchasing CodeSmart stock in IA Firm 1's clients' accounts, BELL was selling CodeSmart shares in his personal trading account. Specifically, in or about and between May 2013 and October 2013, IA Firm 1's clients purchased approximately one million shares of

9

CodeSmart, while BELL sold approximately 99,500 of the 125,000 free trading or unrestricted shares of CodeSmart in his personal brokerage account. Nearly half of the one million CodeSmart shares purchased in IA Firm 1's clients' accounts were purchased in Individual Retirement Accounts ("IRAs").

26.    At the same time that the defendant CRAIG JOSEPHBERG, also known as "Jobo," together with others, was purchasing CodeSmart stock in BD Firm 3's customers' accounts, JOSEPHBERG was selling CodeSmart stock in Garper's brokerage accounts. Specifically, in or about and between May 2013 and October 2013, BD Firm 3's customers purchased approximately 140,000 shares of CodeSmart, while JOSEPHBERG sold approximately 256,000 shares of CodeSmart stock in Garper's brokerage accounts.

27.    On or about and between May 13, 2013 and August 7, 2013 alone, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, MATTHEW BELL and CRAIG JOSEPHBERG, also known as "Jobo," sold approximately 834,472 shares of CodeSmart in their personal accounts while BELL and JOSEPHBERG purchased 814,827 shares of CodeSmart in their clients' and customers' accounts.

28.    The defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW BELL and CRAIG JOSEPHBERG, also known as "Jobo," profited through their fraudulent manipulation of CodeSmart's stock. The defendants profited as follows: (a) DISCALA profited at least $3 million from trading CodeSmart's stock, which included $600,000 in profit from an account held in his administrative assistant's name; (b) WEXLER profited at least $2.2 million; (c) BELL profited at least $550,000; (d) JOSEPHBERG profited at least $750,000; and (e) SHAPIRO was paid an annual salary of approximately $225,000.

B.    The Cubed Manipulation Scheme

    (i)    The Formation of Cubed

29.    On March 6, 2014, Northwest, a shell public company with only nominal assets and no revenues, appointed John Doe 1, an individual whose identity is known to the Grand Jury, the President and Chief Operating Officer of Crackpot, Inc. ("Crackpot"), a private company, as its sole officer and director.  Crackpot marketed itself as a "developer of a mobile-first information communications technology that offers users a digital platform for the creation of content that combines text, images, audio, and video."  A week later, on March 14, 2014, Northwest filed with the SEC a Form 8-K explaining that Northwest had changed its name to Cubed.

30.    On March 24, 2014, Cubed filed with the SEC a Form 8-K stating that it had entered into an intellectual property purchase agreement (the "Asset Purchase Agreement") with Crackpot pursuant to which it acquired intellectual property, specifically a "mobile-first platform," from Crackpot.  In exchange for this intellectual property, Cubed agreed to pay Crackpot $350,000 and 2,537,455 restricted shares of Cubed.  Cubed had no assets and was a penny stock at the time of the Asset Purchase Agreement.  Through this Asset Purchase Agreement, Crackpot, a private company, effectively became Cubed, a public company.  On March 26, 2014, Cubed's board of directors appointed John Doe 2, an individual whose identity is known to the Grand Jury, the original founder of Crackpot, as the new Chief Executive Officer and President, replacing John Doe 1.

    (ii)    The Fraudulent Stock Manipulation

31.    On March 28, 2014, 200 shares of Cubed were sold at $5.00 per share. Based on the $5.00 share price and its outstanding common stock, Cubed had a market

capitalization of approximately $150 million.  On April 22, 2014, after 15 days of no trading

activity, Cubed's stock began trading in earnest at a price of $5.25; the stock closed that day at

$5.20.

32.     On or about and between April 22, 2014 and April 30, 2014, the

defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER,

MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and

VICTOR AZRAK, together with others (collectively, the "Cubed Co-Conspirators"), were

responsible for manipulating the vast majority of the trading activity in Cubed.  Specifically, the

Cubed Co-Conspirators purchased more than 50% of the total number of Cubed shares

purchased during this period.  The Cubed Co-Conspirators used BD Firm 4, where

JOSEPHBERG was employed, to execute these fraudulent trades.

33.     In or about and between March 2014 and July 2014, the defendants

ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, MATTHEW BELL,

CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK,

together with others, devised a scheme whereby they fraudulently manipulated Cubed's stock by

artificially controlling the price and volume of Cubed's stock through, inter alia, wash trades and

match trades.

34.     Wash trades are purchases and sales of securities that match each other in

price, volume and time of execution, and involve no change in beneficial ownership.  For

example, a wash trade takes place when Investor A buys 100 shares at $5.00 of Company A

through Broker A while simultaneously selling 100 shares at $5.00 of Company A through

Broker B.  Match trades are similar to wash trades but involve a related third person or party who

places one side of the trade.  For example, a match trade takes place when Investor A buys 100

12

shares at $5.00 of Company A through a broker, while Investor B, who coordinates with Investor A, simultaneous sells 100 shares at $5.00 of Company A through a broker. Both wash trades and match trades are used to create the appearance that the stock price rose as a result of genuine market demand for the securities.

35.     On or about and between May 2, 2014 and June 29, 2014, law enforcement authorities conducted a judicially-authorized wiretap of the defendant ABRAXAS J. DISCALA's, also known as "AJ Discala," cellular telephone (the "Discala Wiretap"). The Discala Wiretap revealed that the Cubed Co-Conspirators used wash trades and match trades to manipulate Cubed's stock price and volume. Rather than generating significant market interest and causing a quick pump and dump that would elicit regulators' scrutiny, the Cubed Co-Conspirators engaged in a scheme that gradually increased the price of Cubed's stock to give it the appearance of a legitimate company with genuine and steady market demand for the security.

36.     For example, on or about and between April 22, 2014 and May 22, 2014, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK, together with others, successfully manipulated Cubed's stock, causing its share price to gradually increase from a closing price of $5.20 on April 22, 2014 to a closing price of $5.42 on May 22, 2014. During this period, DISCALA controlled the fraudulent manipulation of Cubed's stock by directing the price and volume of Cubed's shares traded on the market. For example, on May 6, 2014, DISCALA sent a text message to JOSEPHBERG stating, "Go 531. Please." That day, Cubed's stock closed at $5.32 per share.

13

(iii)    The Escrow Account

37.    To successfully execute their fraudulent scheme of causing a controlled rise of Cubed's stock, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK, together with others, used an escrow account that was maintained by CANE to manipulate the price and volume of Cubed's stock. For example, on May 13, 2014, while discussing Cubed, BELL sent a text message to DISCALA, and asked, "How[']s the escrow going[?]," to which DISCALA responded, "Need sales. Need buyers." On May 20, 2014, during a telephone call between DISCALA and AZRAK, after discussing a conversation between JOSEPHBERG and CANE about the escrow account, DISCALA explained his control over Cubed's share price, and stated, in part, "I'm the [expletive] brake and the gas, [expletive]. If I take my foot off the brake it's 55 [dollars] tomorrow (Laughter)."

38.    On May 23, 2014, due to poor coordination with a co-conspirator, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," briefly lost control of his manipulation of Cubed's share price, which caused it to surge from the previous day's closing price of $5.42 to an intraday high of $7.05 per share. However, as explained below, DISCALA regained control that same day and brought the share price back down to have it close at $6.30 per share.

39.    During three telephone calls that day, May 23, 2014, the defendant ABRAXAS J. DISCALA's, also known as "AJ Discala," control of the price of Cubed's stock is apparent. During a telephone call that morning, DISCALA and the defendant KYLEEN CANE discussed the jump in Cubed's price to $7 per share, and CANE stated, in part, "We need to keep it back down now. We need to keep it back down." Later that day, during a telephone call

14

between DISCALA and the defendant VICTOR AZRAK, DISCALA stated, in part, "I talked to Kyleen [CANE], and we, we don't want this. We would want 6.35 today, 6.30, something like that, and then let, let news rip it next week." Finally, DISCALA also called the defendant MARC WEXLER to explain the trading in Cubed's share price, and stated, in part, "Yeah like...it just looks stupid! It went up, and up, and then it came back, you know – it's like, look, if we ended at 6.30, we're good. I wanna bring it back up to 6.55; 6.55 on Tuesday, which I can, with some news, right? And just keep stepping it."

       40.     The defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK, together with others, are continuing to fraudulently manipulate Cubed's stock using the escrow account. On June 23, 2014, Cubed reached its highest closing price of $6.75 per share. At $6.75 per share, Cubed's market capitalization was approximately $200 million. On April 21, 2014, however, Cubed filed with the SEC a Form 10-Q and reported less than $1,500 in cash, zero revenue, negative stockholders' equity, a net loss of $15,000 and accrued professional fees of $131,824. On July 9, 2014, Cubed's stock price closed at $6.60 per share and was, thus, still in the controlled pump phase of the fraudulent manipulation scheme orchestrated by the Cubed Co-Conspirators.

      C.     The StarStream and Staffing Group Manipulation Schemes

       41.     In or about and between October 2013 and July 2014, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK, together with others, agreed to fraudulently manipulate StarStream's and Staffing Group's stocks

by artificially controlling the price and volume of StarStream's and Staffing Group's stocks through, inter alia, wash trades and match trades.

(i)    The StarStream Manipulation

42.    In furtherance of the scheme to manipulate StarStream's stock, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK, together with others, coordinated the fraudulent buying and selling of StarStream's stock through the use of, inter alia, text messages and telephone calls.

43.    On May 7, 2014, WEXLER sent a text message to DISCALA, stating, "We may need to buy SSET at close. I think EJA has some $. Got get it to 15 cents. LOL what a joke." That day, StarStream's stock price closed at $0.30 on 41,100 trading volume, a significant decrease from the previous day's closing price of $0.48 on 16,200 trading volume. The following day, on May 8, 2014, StarStream's stock price closed at $0.15 per share, exactly the price proposed by WEXLER.

44.    On May 13, 2014, before trading commenced, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," sent a text message to the defendant MATTHEW BELL, stating, "We got good stuff going. Sset. Should be over a buck today." That day, StarStream's stock price, which opened at $0.35 per share, reached an intraday high of $1.05 per share, before closing at $0.80 per share.

(ii)    The Staffing Group Manipulation

45.    In furtherance of the scheme to manipulate Staffing Group's stock, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and

VICTOR AZRAK, together with others, coordinated the fraudulent buying and selling of Staffing Group's stock through the use of, inter alia, text messages and telephone calls.

46.     On May 7, 2014, BELL sent a text message to DISCALA, stating, "TSGL is tanking. We still good?" In response, DISCALA stated, "Yes. Buy all u can at 20 or better. We're cleaning it up." On May 7, 2014, Staffing Group's stock price closed at $0.25 on 178,300 trading volume, a significant decrease from the previous day's closing price of $0.36 on no trading volume.

47.     On May 16, 2014, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," sent a text message to the defendant CRAIG JOSEPHBERG, also known as "Jobo," stating, "Call in victors [AZRAK] tsgl. Supposed to be good til cancel. This shot affects us." On May 16, 2014, the trading volume in the Staffing Group was 13,500 compared to 1,700 on the previous trading day and 2,500 on the following trading day.

48.     On May 30, 2014, the defendant ABRAXAS J. DISCALA, also known as "AJ Discala," sent a text message to the defendant MARC WEXLER, stating, "Buy 5k more ts [TSGL] market im gonna get this thing flying." On May 30, 2014, Staffing Group's stock price closed at $0.42 per share on 187,300 trading volume, which was almost double the closing price of $0.23 on 6,000 trading volume on the previous day.

### COUNT ONE
(Conspiracy to Commit Securities Fraud –
the Manipulated Public Companies)

49.     The allegations contained in paragraphs one through forty-eight are realleged and incorporated as though fully set forth in this paragraph.

50.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in the Manipulated Public Companies, in connection with the purchase and sale of investments in the Manipulated Public Companies, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

      51.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK, together with others, committed and caused to be committed, among others, the following:

OVERT ACTS

      a.    On or about June 4, 2013, SHAPIRO sent an email to John Doe 3, a representative of Ramapo College of New Jersey whose identity is known to the Grand Jury, copying two of SHAPIRO's colleagues, whose identities are known to the Grand Jury, and

18

stated, in part, "My apologies on behalf of CODESMART.  We did not know about that language you [sic] were allowed to use and certainly will consult with you next time we do a promotion.  This is all done in a spirit of promoting business opportunities for you as a partner."

   b. On or about July 22, 2013, WEXLER and BELL entered into a purchase agreement whereby WEXLER sold BELL 50,000 shares of CodeSmart common stock for $28,000 at a purchase price of $0.56 per share.

   c. On or about August 15, 2013, DISCALA signed a purchase agreement on behalf of Fidelis whereby he sold 25,000 shares of CodeSmart common stock to Victim 1, an individual whose identity is known to the Grand Jury, for $3,500 at a purchase price of $0.14 per share.

   d. On or about August 27, 2013, SHAPIRO filed with the SEC a Form 8-K on behalf of CodeSmart and stated that he had purchased 25,000 shares of the company's stock from the public market at the market value of $3.21 per share for a cost of $80,250.

   e. On or about April 11, 2014, BELL sent a text message to DISCALA, stating, "FedEx send you money for cube on Monday. Made out to Omniview."

   f. On or about May 12, 2014, during a telephone call between DISCALA and AZRAK, AZRAK stated, in part, "We should start sending [JOSEPHBERG] morons, by the way.  We could trade for free, you know, send him a moron, you know, a guy you don't know and then we'll just buy stocks and if they don't go up by the end, we'll buy, like, options – Twitter options – that expire in, like, a day.  Either we'll make like twenty times or we'll just give him the stock."

g.      On or about May 17, 2014, during a telephone call between DISCALA and WEXLER, DISCALA stated, in part, "So our deal is going to pay the Cube two-fifty, cause these guys can't generate revenue, so I'm going to generate it myself."

h.      On or about May 20, 2014, during a telephone call between DISCALA and AZRAK, DISCALA stated, in part, "Right, because I'm the [expletive] brake and the gas, [expletive].  If I take my foot off the brake it's 55 [dollars] tomorrow (Laughter)."

i.      On or about May 21, 2014, during a telephone call between DISCALA and CANE, CANE stated, in part, "You know [the Investor Relations/Public Relations guys are] going to be doing it and I also just talked to two people that are gonna probably going to put in another half a million into Cubed for some interim, interim money."

j.      On or about May 22, 2014, during a telephone call between DISCALA and JOSEPHBERG, JOSEPHBERG stated, in part, "I don't want to be the only one buying today.  I heard it looks very bad for a broker to be the only one buying, that's what I heard."

k.      On or about May 27, 2014, during a telephone call between DISCALA and CANE, CANE stated, in part, "Well it's um, it's gonna start happening . . . I don't know if the press has even come out yet.  There's gonna be a release today . . . on the . . . acquisition . . . we're having a conference call in about 30 minutes with the first PR that's gonna go out – the PR group."

l.      On or about June 6, 2014, during a telephone call between DISCALA and WEXLER, WEXLER stated, in part, "We don't need to go up every [expletive] day, but the bottom line is, you know, we're [expletive] supporting the stock [ ]."

(Title 18, United States Code, Sections 371 and 3551 et seq.)

20

COUNT TWO
(Conspiracy to Commit Mail Fraud and Wire Fraud –
the Manipulated Public Companies)

52.     The allegations contained in paragraphs one through forty-eight are realleged and incorporated as though fully set forth in this paragraph.

53.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK, together with others, did knowingly and intentionally conspire:

a.     to devise a scheme and artifice to defraud investors and potential investors in the Manipulated Public Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to cause to be delivered matter and things by FedEx Corp. ("FedEx") and other private and commercial interstate carriers according to the direction thereon, contrary to Title 18, United States Code, Section 1341; and

b.     to devise a scheme and artifice to defraud investors and potential investors in the Manipulated Public Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

21

COUNT THREE
(Securities Fraud – CodeSmart)

54.     The allegations contained in paragraphs one through twenty-eight are realleged and incorporated as though fully set forth in this paragraph.

55.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW BELL, and CRAIG JOSEPHBERG, also known as "Jobo," together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in CodeSmart, in connection with the purchases and sales of investments in CodeSmart, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

22

COUNT FOUR
(Securities Fraud – Cubed)

56.   The allegations contained in paragraphs one through thirteen and twenty-nine through forty are realleged and incorporated as though fully set forth in this paragraph.

57.   In or about and between March 2014 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in Cubed, in connection with the purchases and sales of investments in Cubed, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNTS FIVE THROUGH TEN
(Wire Fraud)

58.     The allegations contained in paragraphs one through forty-eight are reealleged and incorporated as though fully set forth in this paragraph.

59.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, CRAIG JOSEPHBERG, also known as "Jobo," and VICTOR AZRAK, together with others, did knowingly and intentionally devise a scheme and artifice to defraud investors and potential investors in the Manipulated Public Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises.

60.     On or about the dates set forth below, for the purpose of executing such scheme and artifice, the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, CRAIG JOSEPHBERG, also known as "Jobo," and VICTOR AZRAK, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, as set forth below:

| Count | Defendant(s) | Date | Description |
|---|---|---|---|
| FIVE | DISCALA and WEXLER | 05/09/2014 | Telephone call from DISCALA to WEXLER discussing, inter alia, the manipulation of Cubed's stock. |
| SIX | DISCALA | 05/09/2014 | Telephone call from DISCALA to Broker 1, an individual whose identity is known to the Grand Jury, discussing, inter alia, the manipulation of Cubed's stock. |

24

| Count | Defendant(s) | Date | Description |
|-------|-------------|------|-------------|
| SEVEN | DISCALA and AZRAK | 05/09/2014 | Telephone call from DISCALA to AZRAK discussing, inter alia, the manipulation of Cubed's and StarStream's stocks. |
| EIGHT | DISCALA | 06/12/2014 | Telephone call from DISCALA to Trader 1, an individual whose identity is known to the Grand Jury, discussing, inter alia, the manipulation of StarStream's stock. |
| NINE | DISCALA and JOSEPHBERG | 06/12/2014 | Telephone call from DISCALA to JOSEPHBERG discussing, inter alia, the manipulation of StarStream's stock. |
| TEN | DISCALA and WEXLER | 06/12/2014 | Telephone call from DISCALA to WEXLER discussing, inter alia, the manipulation of CodeSmart's, Cubed's and StarStream's stock. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

<u>CRIMINAL FORFEITURE ALLEGATION</u>

61.     The United States hereby gives notice to the defendants ABRAXAS J.

DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW

BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK

that, upon conviction of any of the above-charged offenses, the government will seek forfeiture,

in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

Code, Section 2461(c), of any property, real or personal, which constitutes or is derived from

proceeds traceable to any of the above-charged offenses, including but not limited to the

following:

a.     real property and premises known as 10 Vincent Place, Norwalk,

Connecticut, and all proceeds traceable thereto.

62.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants ABRAXAS J. DISCALA, also known as "AJ Discala," MARC WEXLER, IRA SHAPIRO, MATTHEW BELL, CRAIG JOSEPHBERG, also known as "Jobo," KYLEEN CANE and VICTOR AZRAK:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

_____
FOREPERSON

_____
LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY:_____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

26

No. 13-0553

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

### THE UNITED STATES OF AMERICA

*vs.*

*ABRAXAS J. DISCALA, et al.,*

Defendants.

## INDICTMENT

(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18, U.S.C., §§ 371, 981(a)(1)(C),
1343, 1349, 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                        *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                                *Clerk*

*Bail, $* _____

*Winston M. Paes, Assistant U.S. Attorney (718) 254-6023*

F. #2013R01203
FORM DBD-34
JUN. 85